IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

ANTHONY "ANDY" THOMPSON,    :
    :
    Plaintiff,    :
    :    No. 5:11-cv-189 (CAR)
    v.    :
    :
TYSON FOODS, INC.,    :
    :
    Defendant.    :
_____    :

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Anthony Thompson brings this action for reverse discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiff contends his former employer, Defendant Tyson Foods, Inc., discharged him because he is Caucasian. Before the Court is Defendant's Motion for Summary Judgment [Doc. 20]. After fully considering the matter, the Court finds Defendant is entitled to judgment as a matter of law, and its Motion for Summary Judgment [Doc. 20] is therefore **GRANTED**.

## BACKGROUND

Defendant maintains a progressive discipline policy. However, on April 27, 2009, Defendant terminated Plaintiff for insubordination upon his first offense. Plaintiff

1

contends Defendant discriminatorily applies its progressive discipline policy with a race-based double standard, and because he is Caucasian, Defendant terminated him instead of giving him the benefit of progressive discipline like his African-American co-workers.  Defendant maintains its decision to terminate Plaintiff was based solely on Plaintiff's misconduct, not on Plaintiff's race.  The facts viewed in the light most favorable to Plaintiff are as follows.

**Plaintiff's Employment with Defendant**

Defendant is one of the world's largest processors and marketers of poultry, pork, and beef, and operates a poultry processing plant in Vienna, Georgia where Plaintiff was employed from July 12, 2004, until his termination on April 27, 2009.[1] Defendant hired Plaintiff as a Maintenance Supervisor.[2]  On October 9, 2005, Plaintiff was promoted to Maintenance Manager, and then in 2006, to General Production Manager ("GPM"), the position he held until he was terminated.[3] Plant Manager Leon Dixon (African-American) authorized both of Plaintiff's promotions and ultimately terminated him on April 27, 2009.[4]

---

[1] Pl. Depo., pp. 29, 138-39 [Doc. 22-1].

[2] Pl.'s Application of Employment, Pl. Depo., Ex. 1 [Doc. 22-1]; Personnel Action Form, Pl. Depo., Ex. 2 [Doc. 22-1]; Pl. Depo., pp. 27, 31 [Doc 22-1].

[3] Pl. Depo., pp. 29, 36 [Doc. 22-1].

[4] *Id.*, pp. 34, 45-46, 64, 69 [Doc. 22-1]; Personnel Action Form, Pl. Depo., p. 31, Ex. 2. [Doc. 22-1].

As a GPM, only two other individuals – Dixon, the Plant Manager, and Hal Shadrick (Caucasian), the Assistant Plant Manager – held higher positions than Plaintiff at the plant.[5]  At the time of his termination, Plaintiff was one of only five GPMs, three of whom, including Plaintiff, worked on the day shift, and two of whom worked on the night shift.  As a GPM, Plaintiff was responsible for managing the production process on his shift.[6]  Plaintiff directly supervised four Supervisors, who, in turn supervised certain hourly employees.[7]  Approximately 125 to 150 total employees, including the hourly employees, reported to Plaintiff as a GPM.[8]  Prior to his termination, Plaintiff had not been counseled or disciplined for any conduct or performance issues, and, throughout his employment, he had been rated as a strong performer on his performance reviews.[9]

**Defendant's Relevant Business Policies**

Defendant has implemented and maintains various policies setting standards for its employees' conduct and outlining consequences for their misconduct.  Defendant, through both formal policies and informal practices, holds its employees in

---

[5] Shadrick Depo., p. 35 [Doc. 22-10]; Dixon Depo., pp. 20-21 [Doc. 22-4].
[6] Dixon Depo., pp. 33, 35 [Doc. 22-4]; Shadrick Depo., p. 13 [Doc. 22-10]; Pl. Depo., p. 42 [Doc. 22-1]; Zanders Depo., p. 39 [Doc. 22-5].
[7] Shadrick Depo., p. 35 [Doc. 22-10]; Pl. Depo., pp. 44-45 [Doc. 22-1].
[8] Pl. Depo., pp. 44-45 [Doc. 22-1].
[9] Zanders Depo., p. 52-53 [Doc. 22-5]; Dixon Depo., pp. 64, 69 [Doc. 22-4].

management roles to higher performance and behavioral standards than those employees in non-supervisory roles.   Defendant has implemented a Management Standards of Behavior Policy, setting forth behavioral standards specific to its management employees.[10]  In addition, in practice, Defendant holds its Supervisors, the first level of management employees, to a higher performance standard than it does non-supervisory employees who report to the Supervisors.[11]   Defendant holds its GPMs, the second level of management employees who supervise the Supervisors, to an even higher standard.[12]   Indeed, the respective standards mirror the managers' duties and responsibilities.   Unlike Supervisors, who are responsible for specific functions within departments, GPMs are responsible for entire departments and report directly to the Assistant Plant Manager, who, in turn, reports directly to the Plant Manager.[13]

Defendant also maintains a Rules of Conduct Policy, applicable to all of its employees, which generally provides for progressive discipline based upon both the seriousness of the violation and prior violations.[14]  In specific circumstances, however,

---

[10] Pl. Depo., p. 55 [Doc. 22-1]; Management Standards of Behavior, Pl. Depo., Ex. 6 [Doc. 22-1].
[11] Pl. Depo., pp. 36, 55 [Doc. 22-1].
[12] *Id.*
[13] Shadrick Depo., p. 35 [Doc. 22-10]; Dixon Depo., p. 20 [Doc. 22-4].
[14] Pl. Depo., p. 51 [Doc. 22-1]; Rules of Conduct Policy, Pl. Depo., Ex. 4. [Doc. 22-1].

the policy mandates discharge after investigation upon a first offense, including an offense of insubordination.[15]

## April 23, 2009 Meeting

On April 23, 2009, Plant Manager Dixon held his weekly staff meeting with the plant managers, which included the managers who reported directly to Dixon and the five GPMs.[16] After completing his initial discussions with the entire management staff, Dixon excused everyone except Assistant Plant Manager Shadrick and the attending GPMs, including Plaintiff.[17]  Dixon addressed production concerns with each GPM in connection with his or her respective department.[18] While addressing Plaintiff, Dixon and Plaintiff engaged in a "heated" exchange.[19] Dixon's voice became elevated in volume and tone, and his body language and gestures were "combative."[20]  As Dixon and Plaintiff discussed certain equipment performance issues in Plaintiff's department, Plaintiff gathered his things and left the meeting "to remove [him]self from a situation until cooler heads could prevail."[21]  At the time Plaintiff left the meeting, Plaintiff

---

[15] Rules of Conduct Policy, Pl. Depo., Ex. 4. [Doc. 22-1].

[16] Dixon Depo., p. 25 [Doc. 22-4].

[17] Pl. Depo., p. 68 [Doc. 22-1]; Dixon Depo., p. 31 [Doc. 22-4].

[18] Dixon Depo., p. 32 [Doc. 22-4]; Mar. Capers Depo., p. 25 [Doc. 22-8].

[19] Mar. Capers Depo., p. 35 [Doc. 22-8].

[20] Pl. Depo., p. 98 [Doc. 22-1].

[21] *Id.*, p. 122.

considered the meeting to be at its end.[22]  Dixon, however, had neither adjourned the meeting nor excused Plaintiff.  All the other attendees were seated when Plaintiff left, and the meeting ended a short while later.[23]  While it may not have been unusual for managers to leave a meeting early when they received prior permission, it was clearly inappropriate to leave a meeting without either the Assistant Plant Manager or Plant Manager's permission.[24] After leaving the meeting, Plaintiff dropped off some items in his office, and, because his shift had ended, Plaintiff left the facility.

**Plaintiff's Termination**

Because Plaintiff walked out of an ongoing, mandatory staff meeting without permission, Dixon perceived Plaintiff's actions as insubordinate.[25]  After the meeting ended, Dixon informed Human Resources Manager Wanda Zanders (African-American) that Plaintiff had walked out of a meeting and asked her whether Plaintiff was still present at the plant.[26]  Zanders telephoned Plaintiff, who was at home, and asked that he return to the plant to meet with her and Dixon.[27] Plaintiff immediately returned to the plant.[28]  On his drive back to the facility, Plaintiff called and spoke with

---

[22] *Id.*, pp. 123, 130.
[23] Dixon Depo., p. 45 [Doc. 22-4].
[24] Mar. Capers Depo., pp. 28-29 [Doc. 22-8].
[25] Dixon Depo., p. 57 [Doc. 22-4].
[26] *Id.*, p. 46; Zanders Depo., p. 17 [Doc. 22-5].
[27] Zanders Depo., p. 18 [Doc. 22-5].
[28] *Id.*

Wingate Taylor (Caucasian), Complex Human Resources Manager,[29] who told Plaintiff he had not acted insubordinately because he had left the facility after his shift ended. [30]

During the meeting with Dixon and Zanders, Dixon told Plaintiff that he was "disappointed" in Plaintiff's actions and "felt like [he] walked out on the team."[31] Plaintiff responded that he "didn't walk out on the team" but admitted that he "removed [him]self until cooler heads could prevail."[32]  Plaintiff also told Dixon that he was disappointed in Dixon's actions.[33]  Dixon told Plaintiff that he should take off the remainder of the week to think about whether he wanted to remain part of the team, and if so, he would need to prepare an action plan and return to work on Monday, April 27th.[34]  In accordance with Dixon's instructions, Plaintiff turned in his keys, badge, and radio, and returned home.[35]

After Plaintiff left the facility, Dixon spoke with his supervisor, Complex Manager Richard Shewmaker, about Plaintiff's actions.  Shewmaker advised Dixon to

---

[29] "Complex" management denotes individuals in management capacity who supervise a complex of plants located in South Georgia, including Defendant's plants in Vienna, Dawson, and Buena Vista.  Pl. Depo., p. 46-47 [Doc. 22-1].

[30] Pl. Depo., pp. 134-35, 137 [Doc. 22-1].

[31] *Id.*, p. 132.

[32] *Id.*

[33] *Id.*

[34] Pl. Depo., pp. 132-33 [Doc. 22-1]; Timeline for Andy Thompson Incident, Dixon Depo., Ex. 10 [Doc. 22-4]; Dixon Depo., pp. 50, 85-86 [Doc. 22-4]; Zanders Depo., p. 19 [Doc. 22-5].

[35] Pl. Depo., p. 133 [Doc. 22-1].

coach and counsel Plaintiff.[36]   However, Shewmaker also told Dixon that it was his opinion that leaving a meeting unexcused and leaving the premises constituted walking off the job.[37]

On Sunday, April 26, 2009, Dixon telephoned Zanders that he had decided to ask Plaintiff for his resignation or, in the alternative, to terminate his employment.[38]   Dixon instructed Zanders to telephone Plaintiff on Monday morning to inform Plaintiff of Dixon's decision to terminate him.[39]

Defendant requires approval for all decisions to terminate management from either the Complex Human Resources Manager or his superior, the Divisional Human Resources Manager.[40]   Thus, Zanders had to get approval to terminate Plaintiff.[41] Zanders attempted to contact Complex Human Resources Manager Taylor on his cell phone to discuss Plaintiff's misconduct and discipline.[42] Zanders, however, had to leave a voicemail because Taylor was on vacation at that time.[43]   Having received no response from Taylor, Zanders telephoned Divisional Human Resources Director Frank Carter

---

[36] Dixon Depo., p. 54-55 [Doc. 22-4].
[37] Shewmaker Depo., p. 44 [Doc. 22-6].
[38] Dixon Depo., p. 55 [Doc. 22-1]; Zanders Depo., p. 28 [Doc. 22-5].
[39] Dixon Depo., pp. 55, 64; Timeline for Andy Thompson Incident, Dixon Depo., Ex. 10 [Doc. 22-4].
[40] Dixon Depo., p. 69 [Doc. 22-1].
[41] *Id.*, p. 70.
[42] Zanders Depo., p. 73 [Doc. 22-5].
[43] *Id.*, p. 72.

(African-American), who was one level higher in Defendant's management hierarchy.[44] After hearing about Plaintiff's conduct, Carter told Zanders he was concerned that Plaintiff's actions could lead to others believing they, too, "could [walk out] if they didn't agree with what [Dixon] was saying in the meeting."[45]   Thus, based on the information provided to him, Carter said he could support whatever decision was made regarding Plaintiff's continued employment.[46]   Zanders informed him of Dixon's decision to terminate Plaintiff.[47]

On Monday, April 27th, based on Dixon's recommendation to terminate Plaintiff and Carter's approval, Zanders telephoned Plaintiff and informed him of the decision to terminate his employment or accept a letter of resignation in lieu of termination.[48] Plaintiff refused to submit a letter of resignation, and his employment was terminated.[49] Plaintiff was replaced by Jim Collum, who, like Plaintiff, is Caucasian.[50]

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact

---

[44] Zanders Depo., pp. 61, 73 [Doc. 22-5]; Carter Depo., p. 12 [Doc. 22-9].
[45] Carter Depo., p. 13 [Doc. 22-9].
[46] Zanders Depo., p. 22 [Doc. 22-5].
[47] *Id.*, p. 25 [Doc. 22-5]; Carter Depo., p. 16 [Doc. 22-9].
[48] Pl. Depo., p. 139 [Doc. 22-1].
[49] Pl. Depo., pp. 139, 148 [Doc. 22-1]; Letter from Plaintiff dated May 11, 2009, entitled "Formal complaint over wrongful termination, Pl. Depo., Ex. 19 [Doc. 22-2].
[50] Pl. Depo., p. 187 [Doc. 22-1].

and the movant is entitled to judgment as a matter of law."[51]   A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[52]   Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[53]   When ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the party opposing the motion.[54]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[55]   If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[56]   This evidence must consist of more than mere conclusory allegations or

---

[51] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986 ).

[52] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[53] *See id.* at 249-52.

[54] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[55] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

[56] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.

legal conclusions.[57]

## DISCUSSION

Plaintiff brings his discriminatory discharge claim pursuant to both Title VII and 42 U.S.C. § 1981.  Because "[b]oth of these statutes have the same requirements of proof and use the same analytical framework,"[58] the Court will address the Title VII claims with the understanding that the analysis applies to the § 1981 claims as well.  Title VII makes it unlawful for an employer to "fail or refuse to hire or [ ] discharge any individual, or otherwise [ ] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."[59]

Claims of race discrimination based on circumstantial evidence, as is the case here, are evaluated under the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*.[60]  First, a plaintiff must establish a prima facie case, or "facts adequate to permit an inference of discrimination."[61]  If the plaintiff does so, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for

---

[57] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).
[58] *Standard v. A.B.E.L. Serv., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).
[59] 42 U.S.C. § 2000e-2(a)(1).
[60] 411 U.S. 792 (1973).
[61] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

its action.[62]  If the employer meets this burden, the plaintiff then has an opportunity to show that the employer's proffered reasons for the adverse employment action were merely pretext for discrimination.[63]

**Prima Facie Case**

To establish a prima facie case of discriminatory discharge, Plaintiff must produce circumstantial evidence showing that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated individual outside his protected class or was replaced by a person outside of his protected class.[64]  In this case, Plaintiff cannot establish his prima facie case of discriminatory discharge because he fails to point to a similarly situated comparator who was treated more favorably.[65]

"When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, [the Court must] evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."[66]  A proper comparator is an employee outside of the plaintiff's protected class

---

[62] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

[63] *Id.* at 253.

[64] *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

[65] Plaintiff was replaced by Jim Collum, who, like Plaintiff, is Caucasian.  Therefore, he cannot satisfy his prima facie case by showing he was replaced by someone outside his protected class.

[66] *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quotation omitted).

who is similarly situated to the plaintiff "in all relevant respects."[67]  If this is not the case, "the different application of workplace rules does not constitute illegal discrimination."[68]

In determining whether a comparator is similarly situated to the plaintiff, the Eleventh Circuit has stated that "[t]he relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies."[69]  However, "the quantity and quality of the comparator's misconduct be nearly identical [to the plaintiff's] to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."[70] "The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."[71] "[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination"[72] because different supervisors may employ different disciplinary measures.[73]

---

[67] *Holyfield*, 115 F.3d at 1562.

[68] *Lanthem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999).

[69] *Id.* at 793.

[70] *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *see also Burke-Fowler*, 447 F.3d at 1323.

[71] *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008).

[72] *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001); *see also Mack v. ST Mobile Aerospace Eng'g, Inc.* 195 F. App'x 829, 844 (11th Cir. 2006) (finding comparators not similarly situated to plaintiff because plaintiff reported to different supervisor).

[73] *See Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989).

In an attempt to prove his prima facie case, Plaintiff points to several African-American managerial employees who engaged in misconduct but received lesser punishment. Plaintiff's proposed comparators, however, are not similarly situated to Plaintiff. First, Plaintiff's proposed comparators were neither involved in nor accused of the same or similar misconduct as Plaintiff. Plaintiff was terminated for insubordination because he left an ongoing mandatory meeting without permission. Plaintiff's direct supervisors, the Assistant Plant Manager and the Plant Manager, directly witnessed Plaintiff's misconduct. Indeed, the Plant Manager himself was conducting the meeting.

Plaintiff claims LaWanda Hoover (African-American), a Production Supervisor who was supervised by Plaintiff, received progressive discipline despite her insubordination for failing to attend a meeting Plaintiff directed her to attend. The record does not reflect the specific punishment Hoover received. The evidence regarding Hoover's misconduct comes only from Plaintiff's testimony and Dixon's handwritten notes regarding the incident. No corrective action form or other official document is included in the record. However, even assuming Plaintiff was disciplined for insubordination, the Court can readily conclude that Hoover's misconduct is in no

14

way "nearly identical" to Plaintiff's misconduct.[74]  Hoover asked Plaintiff <u>in advance</u> to be excused from the meeting due to family obligations.[75]  Plaintiff, on the other hand, did not ask permission to leave when he walked out of an ongoing meeting.  Moreover, Hoover appealed the denial of her request to be excused from the meeting to Plant Manager Dixon, who, in turn, told her to discuss the matter with Assistant Plant Manager Shadrick.[76]  Thereafter, Dixon specifically instructed Plaintiff to "consider granting her request."[77]  However, by the time Dixon told Plaintiff to consider excusing Hoover, the meeting had already occurred.[78]  Thus, Dixon referred any disciplinary matters to Shadrick, since he had instructed Hoover to speak with Shadrick about her inability to attend the meeting.  Because the misconduct is not similar and because Shadrick, not Dixon, was the decision maker as to Hoover's punishment, the disciplinary measures are clearly not comparable for purposes of Title VII analysis.[79]  Hoover is therefore not a proper comparator.

---

[74] *Maniccia,* 171 F.3d at 1368.

[75] Dixon's notes regarding LaWanda Hoover dated June 2, 2009, Dixon Depo., Ex. 9 [Doc. 22-4].

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *See Gerwens*, 874 F.2d at 1541; *Thomas v. Dep't of Corrs. of State of Ga.,* 377 F. App'x 873, 880 (11th Cir. 2010) (holding that disciplinary measure undertaken by different supervisors may not be comparable for purposes of Title VII because the fact that different supervisors addressed instances of misconduct may explain a difference in the means of discipline employed to address the misconduct).

Brian Green (African-American), a Production Supervisor who was also supervised by Plaintiff, is likewise an improper comparator.  Green was disciplined for job performance issues including failure to arrive to work on time, being absent from work, and substandard job performance[80] – clearly misconduct that is not the same as Plaintiff's.  Moreover, Plaintiff was the decision maker on each occasion, giving Green progressive discipline – written warnings and suspensions – rather than termination.[81]

Plaintiff recalls that Loretta l/k/u (African-American), a Supervisor, received progressive discipline for falling asleep in a management meeting held by Complex Manager Richard Shewmaker.[82]  Clearly, Loretta's misconduct is in no way "nearly identical" to Plaintiff's misconduct, and the decision-maker with respect to her alleged misconduct was Shewmaker, not Dixon.[83]

Jackie Dean (African American), a Production Supervisor, received progressive discipline on three separate occasions for failing to follow directions, exhibiting unprofessional conduct, and making threatening statements about a member of management.[84]  In July 2009,  Dean's GPM, Jim Collums, reported her for saying that

---

[80] Corrective Action Forms for Brian Green, Pl. Depo, Ex. 23 [Doc. 22-3].
[81] Pl. Depo., pp. 173-79; 205-208; 213 [Doc. 22-1]; Corrective Action Forms for Brian Green, Pl. Depo., Ex. 23 [Doc. 22-3].
[82] Pl. Decl. ¶ 20 [Doc. 24-1].
[83] *Id*. at ¶ 21.
[84] Corrective Action Forms for Jackie Dean, Pl. Depo., Ex. 23 [Doc. 22-3]; Zanders Depo., Ex. 16 [Doc. 22-5].

"Leon Dixon better not get in my face like that again . . . that's okay, every dog will have his day . . . getting up in somebody's face, that's how you end up six feet under."[85] Multiple witnesses corroborated Collum's account; however, Dean herself and other witnesses denied she made any threat toward Dixon.  They said Dean was instead telling another employee, "my dad is six feet under, so you can't tell me what to do."[86] Given the conflicting statements, Defendant determined that insufficient evidence existed to terminate Dean.[87]  Dean, instead, received an unpaid, five-day suspension.[88]

Dean's misconduct and the circumstances surrounding her misconduct are not comparable to Plaintiff's.  Plaintiff's conduct was a direct response to his interaction with Dixon, and Dixon personally observed Plaintiff walk out of the meeting.  Dean, however, made the alleged threat to a third party, not directly to Dixon. Moreover, Plaintiff does not deny that he intentionally left the meeting without permission.  Dean, along with other witnesses, denied she made any purported threat.  Because of the conflicting statements, Defendant determined that insufficient evidence existed to terminate Dean.  Thus, Dean, too, is an improper comparator.

---

[85] Witness Statements regarding Jackie Dean investigation, Zanders Depo., Ex. 15 [Doc. 22-5].
[86] Zanders Depo., pp. 81-82 [Doc. 22-5; Witness Statements regarding Jackie Dean investigation, Zanders Depo., Ex. 15 [Doc. 22-5].
[87] Zanders Depo., pp. 80-81 [Doc. 22-5].
[88] Corrective Action Form for Jackie Dean, Zanders Depo., Ex. 16 [Doc. 22-5].

Edna Spivey (African-American) is also an improper comparator.  Spivey, a Sanitation Superintendent, received progressive discipline for intentionally disregarding instructions given by Dixon.[89]  Dixon directed Spivey "not to remove any link belts off of the conveyor . . . under any circumstances."[90]  During the investigation, Spivey "disclosed [to Zanders] that [she] had intentional[ly] disregarded [Dixon's] instructions."[91]  This misconduct is not "nearly identical" to that committed by Plaintiff.  Moreover, Assistant Plant Manager Shadrick, not Dixon, made the disciplinary decision to suspend Spivey for five days and give her a written warning rather than terminate her.[92]

Marlon Capers (African-American), a GPM on the night shift, received progressive discipline for poor job performance related to labor costs and for his failure to follow instructions on how to manage overstaffing.[93]  Like Plaintiff, Capers was a GPM.  However, his misconduct is not comparable to Plaintiff's.  The corrective action form reflects that Capers was disciplined for "job performance," not for insubordination

---

[89] Zanders Depo., p. 42 [Doc. 22-5]; Corrective Action Statement for Edna Spivey, Zanders Depo., Exs. 29 & 31 [Doc. 22-5]; Pl. Depo., pp. 193-97 [Doc. 22-1]; Pl. Decl. ¶ 11 [Doc. 24-2].
[90] Zanders Depo., p. 31 [Doc. 22-5].
[91] Corrective Action Form for Edna Spivey, Zanders Depo., Ex. 31 [Doc. 22-5].
[92] *Id.*
[93] Zanders Depo., pp. 39-40 [Doc. 22-5]; Corrective Action Form for Marlon Capers, Zanders Depo., Ex. 21 [Doc. 22-5]; Pl. Depo., pp. 193-97 [Doc. 22-1].

or for "refusing direct orders" as Plaintiff has characterized his misconduct.[94]   Plaintiff himself understood Capers' discipline was "related to just poor performance."[95]   In addition, Capers and Plaintiff are not similarly situated because the decision maker with respect to Capers' discipline was the Assistant Plant Manager at that time, Matthew Clawson.[96]   Clawson was not involved in the decision to terminate Plaintiff and was not even the Assistant Plant Manager at the time of Plaintiff's termination.[97]

Maurice Capers (African-American), also a GPM on the night shift, was disciplined on four separate occasions for poor job performance related to "cooler management, production efficiencies, team member management, quality/foreign material complaints, and condemn product/housekeeping."[98] Capers progressively received an action plan, a written warning, and a written warning with a five-day suspension.[99]   Capers was clearly disciplined for performance-related conduct that is in no way comparable to Plaintiff's insubordination. Therefore he, too, is an improper comparator.

---

[94] Corrective Action Form for Marlon Capers, Zanders Depo., Ex. 21 [Doc. 22-5]
[95] Pl. Depo., pp. 194-95 [Doc. 22-1].
[96] Zanders Depo., pp. 39-40 [Doc. 22-5]; Corrective Action Form for Marlon Capers, Zanders Depo., Ex. 21 [Doc. 22-5].
[97] *Id.*
[98] Corrective Actions Forms for Maurice Capers, Maurice Capers Depo., Ex. 45 [Doc. 22-7].
[99] *Id.*

Finally, Plaintiff points to several other African-American Production Supervisors who violated Defendant's policies – Gary Towns, Phascharon Lewis, and Gary Shorter – but received progressive discipline rather than termination. However, there is no evidence regarding what misconduct they engaged in or how they were disciplined. Thus, this Court cannot find them to be proper comparators.

The Court also finds all of the comparators except Marlon Capers, Maurice Capers, and Edna Spivey, are not similarly situated to Plaintiff because they were lower-level managers subject to different expectations than Plaintiff as an upper level manager. Higher-level employees are expected to set standards for lower-level employees, and therefore it is entirely reasonable for an employer to tolerate certain misconduct from lower-level employees that it would not tolerate from higher-level employees. As a GPM, Plaintiff directly supervised four Production Supervisors, the very positions held by the majority of Plaintiff's proposed comparators. Indeed, all Production Supervisors, as the first tier of management, reported directly to the GPMs. As a GPM, Plaintiff was unquestionably held to a higher level of responsibility, professionalism, standards of behavior, and performance expectations than Production

Supervisors.[100]   Thus, even if these lower-level employees had committed the same or similar conduct, they still are not similarly situated to Plaintiff.

Plaintiff argues he is similarly situated to his proposed comparators despite their differing ranks because they all were subject to the same progressive disciplinary policy that Defendant discriminatorily applied based on race.   Plaintiff cites *Lanthem v. Department of Children and Youth Services*, in support of his argument.[101]   In *Lanthem*, a lower-ranked employee of the Georgia Department of Juvenile Justice and her supervisor both violated the employer's anti-fraternization policy; however, while the supervisor was only suspended, the lower-ranked employee was discharged.[102] Under these circumstances, the Eleventh Circuit found that the plaintiff and her supervisor could function as similarly situated comparators because both were subject not only to the same employment policy but both also violated the same work rule.[103]

Here, Plaintiff and his alleged comparators did not violate the same work rule and in no way engaged in similar misconduct.   Moreover, *Lanthem* did not involve a situation where application of the policy could differ based on the employer's higher expectations from the supervisory employee.   This Court has stated before that "[t]he

---

[100] Pl. Depo., pp. 36, 55 [Doc. 22-1].
[101] 172 F.3d 786 (11th Cir. 1999).
[102] *Id*. at 786-90.
[103] *Id*. at 793.

holding *Lanthem . . .* only extends so far."[104]  Unquestionably, a difference in title and rank may be relevant on the issue of whether two proposed comparators are similar situated.  Indeed, the distinction may be dispositive.[105]   Thus, even if this Court found Plaintiff engaged in the same misconduct as his comparators, this Court cannot second guess Defendant's employment decision to terminate a higher ranking employee held to higher performance standard.

Because Plaintiff has failed to point to a similarly situated African-American comparator who was disciplined less harshly, Plaintiff cannot establish his prima facie case of discrimination, and Defendant is entitled to summary judgment.

**<u>Pretext</u>**

Even if Plaintiff had established his prima facie case of discrimination, Defendant is still entitled to summary judgment because Plaintiff cannot show that Defendant's legitimate, nondiscriminatory reason for termination is merely pretext for race discrimination.   Defendant's legitimate reason for termination–Plaintiff's insubordination – is one "that might motivate a reasonable employer,"[106] and therefore

---

[104] *Ham v. Ga. Pub. Safety Training Ctr.*, Case No. 5:-08-CV-384 (CAR), 2010 WL 3937340, *10 (M.D. Ga., Sept. 30, 2010).

[105] *See Rioux*, 520 F.3d at 1281 (holding two public employees with different ranks were not similarly situated in race discrimination claim where divergent job responsibilities beyond title alone prevented appropriate comparison).

[106] *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

22

Defendant has satisfied its "exceedingly light" burden of producing a legitimate, non-discriminatory reason for Plaintiff's termination. [107]

Because Defendant has met its burden, Plaintiff must present sufficient evidence to create a genuine issue of material fact that Defendant's proffered legitimate reason for termination is merely pretext for race discrimination.   To establish pretext, a "plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision. . . . [The plaintiff] may succeed in this <u>either</u> directly by persuading the court that a discriminatory reason more likely motivated the employer <u>or</u> indirectly by showing that the employer's proffered explanation is unworthy of credence."[108]  "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered  .  .  .  extensive evidence of legitimate, non-discriminatory reasons for its actions."[109]   Evidence establishing pretext may include the same evidence initially offered to establish the prima facie case of discrimination.[110]

---

[107] *See Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 769-770 (11th Cir. 2005) (employer's burden is exceedingly light and is satisfied as long as the employer articulates a clear and reasonable non-discriminatory basis for its actions).

[108] *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (emphasis added) (quotations and citation omitted).

[109] *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (quotations and citation omitted).

[110] *Wilson v. B.E. Aerospace*, 376 F.3d 1079, 1088 (11th Cir. 2004).

Plaintiff shows neither that Defendant's proffered reason for termination is unworthy of credence nor that a discriminatory reason motivated his termination. Plaintiff first argues Defendant's proffered reason for termination is unworthy of credence because when Plaintiff left the meeting, he understood it to be over. "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."[111] Thus, Plaintiff's belief that the meeting was over when he walked out is of no consequence.  The critical inquiry is whether Dixon, as the decision maker, believed that Plaintiff left an ongoing meeting without permission.[112]  The evidence is unquestionable that Dixon believed Plaintiff walked out of the meeting prior to dismissal and that his conduct was insubordination.  Indeed, Dixon had Plaintiff return to the plant to discuss Plaintiff's conduct with himself and Zanders.  The record reveals no "weaknesses, implausibilities, inconsistencies, or contradictions" in Defendant's rationale for Plaintiff's termination.[113]

---

[111] *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

[112] *See Riley v. Birmingham Bd. of Educ.*, 154 Fed. Appx. 114, 117 (11th Cir. 2005) (plaintiff's evidence he did not make derogatory remarks to students not dispositive as to whether employer sincerely believed plaintiff made the remarks) (citing *Vessels*, 408 F.3d 763); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466 (11th Cir. 1991); and *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (5th Cir. 1977) ("Even if [the employer] wrongly believed that [the Title VII claimant] violated this policy, if [the employer] acted on this belief it was not guilty of racial discrimination)).

[113] *See Holland v. Gee*, 677 F.3d 1047, 1055-56 (11th Cir. 2012).

Next, Plaintiff argues evidence of pretext exists because Defendant failed to follow its own policy by terminating him rather than providing him with progressive discipline—especially considering Plaintiff had no prior disciplinary history.   While Plaintiff is correct that in some circumstances, an employer's failure to follow its own policies may be evidence of pretext,[114] the evidence here does not establish Defendant deviated from its disciplinary policy.   Plaintiff was terminated for insubordination, and Defendant's policy clearly provides that insubordination is "unacceptable conduct [that] will result in discharge after investigation upon the first offense."[115]   Moreover, as described above, although several African-American managerial employees received progressive discipline rather than outright termination, their conduct was significantly different from Plaintiff's; most were lower-level managers held to lower performance expectations and lower standards of behavior; and indeed, many were disciplined by different decision-makers.

Plaintiff argues evidence of pretext exists because Defendant did not investigate Plaintiff's actions and thus failed to follow its policy that discharge for insubordination will occur "<u>after investigation</u> upon the first offense."[116] Again, the Court disagrees.   The

---

[114] *See, e.g., Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006); *Ash v. Tyson Foods, Inc.*, 128 F. App'x 529, 533 (11th Cir. 2005).
[115] Rules of Conduct Policy, Pl. Depo., Ex. 4 [Doc. 22-1].
[116] *Id.*

record reveals that an investigation did, in fact, occur.  On the same day the incident occurred, Dixon and Zanders called Plaintiff back to the plant and discussed his conduct with him.  Plaintiff did not deny that he walked out of the meeting early and then left the facility, and Dixon, the decision-maker, personally witnessed Plaintiff's conduct.

Finally, Plaintiff also fails to establish that any discriminatory animus motivated Dixon's decision to terminate him.   In fact, because Dixon was the individual responsible for both promoting Plaintiff to GPM and then ultimately firing him, a "permissible inference" arises "that no discriminatory animus motivated [Dixon's] actions."[117] Moreover, the Court finds it entirely reasonable for the Plant Manager to terminate a high-ranking managerial employee for intentionally leaving a meeting prior to dismissal, without permission, that the Plant Manager himself was personally conducting.   Indeed, Plaintiff admits that he intentionally left the meeting so that "cooler heads could prevail" because the situation "was escalating into a situation [where] anger could have . . . caused people to do things that they typically wouldn't do with a cool head."[118]  While Plaintiff may have felt that his termination was unfair, this Court does not sit as a "super-personnel department," and it does not review the

---

[117] *Williams v. Vitro Serv. Corp.*, 144 F.3d 1438, 1443 (11th Cir.1998).
[118] Pl. Depo., pp. 124-25 [Doc. 22-1].

26

wisdom of an employer's business decisions, no matter how mistaken or unfair they may seem, as long as the action was not for a prohibited discriminatory reason.[119] Without a similarly situated comparator or any other sufficient evidence to support an inference of intentional discrimination, Plaintiff has failed to establish his claim of racial discrimination, and Defendant is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment [Doc. 20] is hereby **GRANTED**.

**SO ORDERED,** this 29th day of March, 2013.

S/  C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

SSH/bbp

---

[119] *See Alvarez*, 610 F.3d at 1266-67.